

CR#05-1616-CBS

## AFFIDAVIT OF SPECIAL AGENT DEREK M. DUNN

I, Derek M. Dunn, being duly sworn, hereby depose and state as follows:

### INTRODUCTION

1. I am a Special Agent with United States Immigration and Customs Enforcement ("ICE"), and have been so employed since April 2003. Prior to becoming a Special Agent with ICE, I worked with the United States Customs Service as a Regulatory Auditor for seven years and nine months. I am currently assigned to the New England High Intensity Drug Trafficking Area Financial Task Force. Since April 2003, I have conducted and assisted in several money laundering and drug trafficking investigations. I have received specific training regarding these crimes during my tenure as a Special Agent.

2. I am submitting this affidavit in support of a criminal complaint charging José Felix Palaguachi Cela ("Palaguachi"), with possessing, obtaining, accepting, and receiving a visa, knowing it to be forged, counterfeit and otherwise procured by fraud and unlawfully obtained, in violation of 18 U.S.C. § 1546(a). For the reasons set forth hereinafter, I submit there is probable cause to believe Palaguachi has committed the said violations in the District of Massachusetts.

3. I have included in this affidavit only those facts that I believe establish the requisite probable cause for the issuance of the requested complaint. These facts are either personally known to me, or have been related to me by other federal, state, or local law enforcement officers or employees. The information contained in the Affidavit is submitted for the sole purpose of supplying probable cause for the issuance of the requested complaint. Accordingly, this Affidavit does not contain all of the information known to me regarding this criminal investigation.

### FACTS AND CIRCUMSTANCES

4. In the fall of 2004, a previously reliable cooperating witness (CW), met with Amaro Millan in Multiservices Tuyas, 88 West Elm Street, Brockton, Massachusetts, in connection with an ongoing ICE investigation of Millan for money laundering. Multiservices Tuyas is a money remitting business licensed to operate in the state of Massachusetts. The company also operates as a travel agency, and engages in the sales of phone cards, pagers and money orders. Millan told the CW that he needed assistance in obtaining fraudulent driver's licenses. Based on prior conversations, the CW understood this to refer to licenses for workers of Millan's who were illegal aliens.

5. In October 2004, the CW introduced Millan to an undercover agent (UCA) as a person who could provide false visas. The UCA explained that the visa would be placed in the individual's authentic passport in order to allow the person to obtain a driver's license at the RMV. Millan asked about the price, and the UCA informed Millan that the price would be $2,500 for each visa.

6. On November 12, 2004, Millan spoke with the CW and stated that he had a "friend who needed to go to the embassy," by which the CW understood that Millan had a customer for a false visa. The CW informed Millan that his friend needed to pay for the visa in advance and provide a passport. Millan said that his friend had left the passport and half the money with Millan.

7. On November 16, 2004, the CW met with Millan and Jose Felix Palaguachi ("Palaguachi") at Millan's business. The meeting was consensually recorded and monitored by law enforcement agents. At this meeting, Millan introduced the CW to Palaguachi, who expressed interest in obtaining a visa so he could later apply for a driver's license.

8. The CW asked Palaguachi if his passport had a visa. Palaguachi said it did not. The CW informed Palaguachi that the CW could get him a false work visa. Millan explained the visa would show Palaguachi had entered the country legally and had work authorization. The CW reminded Palaguachi the visa could not be used to get through immigration or to open any bank accounts, and that it would only be good enough to get through the RMV and to apply for a driver's license.

9. Palaguachi said he wanted to go to Quincy to apply for the driver's license. The CW said he could go there or to any other RMV to apply for his driver's license. Further, the CW told Palaguachi it was optional if he wanted to get his license through one of the CW's contacts.

10. Millan explained the driver's license would bear Palaguachi's real name. Palagauchi, however, would be required to pass a computer and driving test. This could be taken in Spanish. The CW orally gave Palaguachi some sample test questions, and informed Palaguachi that by studying the booklet he could pass the test.

11. The CW told Palaguachi to leave a deposit of half the fee with Millan. Once Palaguachi got the license, he could bring the balance to Millan. Millan asked Palaguachi if he understood. Palaguachi said yes and asked if he could leave a check. The CW said to give only cash.

12. Millan then explained the process to Palaguachi again: Palaguachi would give the money to Millan. Once Millan received the passport with visa, he would give the CW the deposit. Palaguachi would give Millan the balance upon receipt of the visa. Once Palaguachi had his license, he would call Millan and tell him to give the CW the balance.

13. Palaguachi asked how long the process would take. The CW said it would take about 3 days. Further, once the visa was issued Palaguachi could apply for a driver's license. The CW,

however, would not wait 3 months for Palaguachi to study and pass the exam before receiving the rest of the money. Rather, the CW would require the money by the next business day after delivering the passport with the visa.

14. On November 17, 2004, the CW met with Millan in a consensually recorded meeting. During this meeting, Millan told the CW that one of the Ecuadorians (believed to be Palaguachi) wanted a cut of the proceeds if he brought in other customers. Millan indicated that he had told him to charge his friends whatever he wanted as long as he maintained the base rate of $3,500 (which included the $2,500 for the UCA as well as a commission for Millan and the CW).

15. Millan told the CW he had to call the Ecuadorians, referring to the visa customers, with the expected delivery date. The CW responded early the following week. Millan then made a telephone call, which the CW understood to be to Palaguachi, with this information, asking him to bring the balance. Millan provided the CW with the passport and corresponding deposit left by Palaguachi. After the meeting, the CW provided these passports and funds to law enforcement agents, who subsequently provided the CW with the false visas.

16. On November 22, 2004, the CW met with Millan in a consensually recorded meeting. During this meeting, the CW delivered the passport containing a fraudulent work visa for Jose Felix Palaguachi Cela. The CW explained to Millan he would have to fill out the white card (I-94 Form) with his personal information. This card reflected the date he entered the country and the expiration date of the visa.

17. On November 23, 2004, the CW placed a consensually recorded telephone call to Millan. During the conversation, Millan stated he was waiting for Palaguachi, who had agreed to come at noon. The CW again suggested Millan tell Palaguachi to go and attempt to take the test on his own. Millan responded no for reasons he had already explained to the CW yesterday.

4

18. On November 26, 2004, the CW placed a consensually recorded telephone call to Millan. During the conversation, Millan told the CW to speak to Palaguachi. The CW told Palaguachi they would meet Monday morning. Palaguachi asked if they would be going "there" on Monday, which the CW understood to be a reference to the RMV. The CW responded no, but informed him he could attempt to take the exam on his own. Palaguachi stated he would wait to go with the CW.

19. On November 29, 2004, the CW met with Millan and Palaguachi in Millan's store, in a consensually recorded meeting. During this meeting, the CW reminded Palaguachi he had told the CW he would attempt to take the exam on his own. The CW asked Palaguachi if he had already obtained the booklet to study for the driving exam. Palaguachi said no. The CW informed them his/her contact was not like "Roosevelt (Street)" where one is handed a counterfeit license. Since these would be legitimate driver's licenses, Palaguachi would have to go through the entire process. The CW stated this was what he/she was trying to coordinate with the contact at the motor vehicle registry in Maine. The CW explained if Palaguachi went with the CW, he would at least have to sit in front of a computer and act as if he was taking the exam. Millan said Palaguachi could do that but nothing more since he was illiterate. Millan told the CW they had to help Palaguachi since he could not do it on his own.

20. The CW reminded Palaguachi he could not use the visa to travel out of the country., stating that although this document would suffice for local use, it would not fool immigration authorities. Palaguachi said he was not planning to travel internationally and use it in that way. Millan stated he could use it to obtain a driver's license or as an additional form of identification.

21. Millan asked Palaguachi if he wanted his passport since he had already paid for it. Palaguachi responded yes since he could use it to deposit checks and withdraw money. The CW

5

showed Palaguachi the work visa contained in the passport. The CW explained that with this work visa Palaguachi could try to apply for a driver's license on his own. The CW then explained the I-94 Form. This form reflected the date Palaguachi allegedly entered the country as well as the expiration date for his work visa. The CW again reminded Palaguachi this document would not be good for immigration purposes.

22. Palaguachi asked if he also would need a letter from the government to obtain his driver's license. Millan explained they would be taking him out of town. Millan stated he would not need such letter. He told Palaguachi to wait until they coordinated this for him. Palaguachi agreed.

23. On December 1, 2004, the CW had another consensually recorded meeting with Millan. During this meeting, Millan gave the CW the balance owed by Palaguachi. The CW subsequently provided the funds to law enforcement agents.

24. On December 2, 2004, the CW placed a consensually recorded telephone call to Millan. During the conversation, Millan told the CW Palaguachi called and inquired about the appointment at the RMV. Millan also informed the CW he would be at his office the following morning.

25. On December 3, 2004, the CW had a consensually recorded meeting with Millan. Millan stated he was waiting for the driver's license appointment for Palaguachi. The CW spoke to Palaguachi on the telephone. The CW explained it was complicated because they would have to take them to the RMV and walk them through the process. The CW asked him to be patient. The CW reiterated the document was so good Palaguachi could test it on his own. Millan stated he needed help and could not take the exam on his own.

26. Millan told the CW if he/she had already taken them to get their licenses, they would have had 10 additional passports lined up. Millan said Palaguachi was the most persistent. Once they got Palaguachi a driver's license, he would get several people more since he had about 10 people working for him.

## CONCLUSION

27. Based upon the above information, and my own training and experience in this case, I believe that there is probable cause to believe that José Felix Palaguachi Cela has obtained, accepted and received a visa, knowing it to be forged, counterfeit, falsely made and otherwise procured by fraud and unlawfully obtained, in violation of 18 U.S.C. § 1546(a).

I declare that the foregoing is true and correct to the best of my knowledge and belief.

_____
DEREK M. DUNN
Special Agent
U.S. Immigration and Customs Enforcement

Subscribed and sworn to
Before me this __13th__ day of January, 2005

_____
HON. CHARLES B. SWARTWOOD III
CHIEF, UNITED STATES MAGISTRATE JUDGE

JS 45 (5/97) - (Revised USAO MA 6/29/04)

**Criminal Case Cover Sheet**             **U.S. District Court - District of Massachusetts**

Place of: __Suffolk__    Category No. __II__    Investigating Agency __ICE/   /IRS__

City __Boston__    Related Case Information:

County __Suffolk__    Superseding Ind./ _____    Case No. _____
           Same _____ New __x__
           Magistrate Judge Case _____
           Search Warrant Case _____
           R 20/R 40 from District _____

**Defendant Information:**

Defendant __Jose Felix Palaguachi Cela__    Juvenile ☐ Yes ☒ No

Alias Name _____

Address _____

Birth date (Year ____ SSN (last 4 ____ Se __M__ Race: __Hispanic__ Nationalit __Ecuadorian__

Defense Counsel if _____ Address: _____

Bar Number: _____

**U.S. Attorney Information:**

AUSA __Nancy Rue__    Bar Number if _____

Interpreter: ☒ Yes ☐ No    List language and/or dialect: __Spanish__

Matter to be SEALED: ☒ Yes ☐ No

☒ Warrant Requested    ☐ Regular Process    ☐ In Custody

**Location Status:**

Arrest Date: _____

☐ Already in Federal Custody _____ in _____
☐ Already in State _____ ☐ Serving Sentence ☐ Awaiting Trial
☐ On Pretrial    Ordered _____ on _____

Charging Document: ☒ Complaint ☐ Information ☐ Indictment

Total # of Counts: ☐ Petty _____ ☐ Misdemeano _____ ☐ Felony _____

Continue on Page 2 for Entry of U.S.C. Citations

☒ I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

Date 1/13/05    Signature of _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

District Court Case Number  (To be filled in by deputy  _____

Name of Defendant    Jose Felix Palaguachi Cela

## U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 18 USC 1546(a) | obtaining false visa | |
| Set 2 | | | |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set | | | |
| Set | | | |
| Set | | | |
| Set | | | |
| Set | | | |
| Set | | | |

**ADDITIONAL INFORMATION:**